UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                          Criminal Case No. 21-20676

v.                                    Honorable Linda V. Parker

KEITH COTTRELL,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 17)

Defendant Keith Cottrell ("Defendant") has been charged with Possession with Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vi). The charge arises from a stop of Defendant by two Michigan State Police officers outside of a Greyhound bus station in Detroit, MI on October 18, 2021. Defendant now moves to suppress the fentanyl the officers uncovered during the stop, claiming he was seized in violation of the Fourth Amendment.

## I.    Factual Background

On October 18, 2021, Officers Chadwick Bloom and Matt Kiser (the "Officers") "performed interdiction" at the Greyhound bus station, which included "observing the queue line for the outbound bus to observe any overt reactions" due to the bus being "utilized regularly by narcotics traffickers moving drugs from

Detroit to out of state destinations." (ECF No. 21 at Pg ID 76–77; ECF No. 21-1 at Pg ID 89.)  Officers surveilled both the inside and outside of the bus station with a focus on arriving passengers. (ECF No. 21 at Pg ID 77.)  According to the Government, Officer Bloom has been in law enforcement for approximately eight years.  (*Id.*)  Officer Kiser has been in law enforcement for approximately twenty-six years. (*Id.*)  Both officers claim to have experience and familiarity with tactics used by drug traffickers to engage in drug trafficking. (*Id.*)

As the bus began boarding for its 12:50 p.m. departure, Defendant was dropped off outside of the station in a car, which departed immediately.  Defendant entered the station carrying a black backpack, a red backpack, and a drawstring bag.  Once Defendant was a few steps inside of the station, he "suddenly stopped, looked down at something in his hand, and then turned and exited the bus station." (ECF No. 17 ¶ 3, Pg ID 47.)  According to the officers, Defendant's behavior of arriving late to the bus station, getting dropped off in a car, seeing marked police presence upon entry into the station, and immediately exiting and getting into a different car other than the one he arrived in, made officers believe that Defendant was attempting to "leave the station due to police presence." (ECF No. 21 at Pg ID 78; ECF No. 21-1 at Pg ID 90.)

At approximately 12:48 p.m., Defendant entered a taxicab as it waited in front of the station.  Within a few seconds after Defendant closed the door, officers

exited the station and headed towards the taxicab where Defendant was located. Upon arriving at the taxicab, one officer placed his laptop on the hood of the car and then both approached the car door, while one officer knocked on the backseat passenger window.  Once the car door opened, the officers approached Defendant and questioned him, which included a request to see his driver's license. According to the Government, Defendant "appeared startled, kept looking past officers, and appeared to fabricate a comment about forgetting his keys." (ECF No. 21 at Pg ID 78.)

The officers then asked Defendant to step out of the car and requested permission to search his bags, at which point Defendant declined.  The officers then ran Defendant's driver's license and discovered that he had an active arrest warrant for cocaine possession.  Defendant was then arrested. Following the arrest and the K9 sniff of Defendant's bags, officers searched the bags and found over 200 grams of a substance containing heroin and fentanyl.

## II.    Parties' Arguments

Defendant moves to suppress the drugs, arguing that the officers lacked reasonable suspicion to seize and search him.  Defendant maintains that the officers had nothing more than a hunch that Defendant was involved in criminal activity, which does not support reasonable suspicion to stop or search him.

3

The Government maintains that the officers had reasonable suspicion of criminal activity to stop Defendant when (1) he arrived late for the bus (2) arrived in a car, entered the bus station and immediately left upon seeing marked officers, (3) got into a taxicab, which was different then the vehicle he arrived in, and (4) immediately attempted to leave the station.  According to the Government, these factors, combined with the fact that Defendant "arrived to board a bus known to law enforcement to be used by drug traffickers to distribute drugs out of state," demonstrates evidence of reasonable suspicion to satisfy the requirements for a *Terry* stop.  (ECF No. 21 at Pg ID 83.)  After reviewing the record, the Court is granting Defendant's motion to suppress due to the officers lacking reasonable suspicion to seize Defendant.

### III.    Applicable Law

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures."  U.S. Const. amend. IV.  A law enforcement officer's stop of a suspect—though potentially brief in duration—demonstrably infringes upon the suspect's liberty and thus constitutes a seizure for Fourth Amendment purposes.  *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

4

An investigatory stop must be lawful at its inception—i.e., justified by the requisite level of suspicion.  *Id.*  [P]ursuant to *Terry*, a warrantless encounter may be countenanced under the Fourth Amendment if an officer has reasonable suspicion that criminal activity may be afoot."  *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). "Reasonable suspicion 'requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'"  *Id*. at 370–71 (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)) (additional quotation marks and citation omitted); *see also United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (reasonable suspicion must be "supported by articulable facts, that criminal activity has occurred or is about to occur."). Moreover, "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Id.* at 371 (quoting *United States v. Pearce,* 531 F.3d 374, 380 (6th Cir. 2008); *United States v. Calvetti*, 836 F.3d 654,666 (6th Cir. 2016).

When conducting a *Terry* stop, the "stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *United States v. Brignoni-Price*, 422 U.S. 873, 881 (1975) (quoting *Terry*, 392 U.S. at 29).  "Typically, this means that an officer may ask the detainee a moderate number of questions to

5

determine his identity and try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014).

For Fourth Amendment purposes, an officer seizes an individual "when the officer restrains the person's freedom of movement 'by means of physical force or a show of authority.'" *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). Stated differently, a seizure occurs "when a reasonable person would not believe he or she was free to leave or disregard the officer's requests." *Id.* (citing *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004)).

To constitute a seizure, the individual must actually surrender to the officer's show of authority. *Id.* (citing *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010)). "The question of when a seizure occurs is relevant because 'once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment.'" *Id.* (quoting *United States v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007)). "Examples of circumstances that indicate a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language

6

or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 689 (quoting *Mendenhall*, 446 U.S. at 554). "Simple police questioning is insufficient to constitute a seizure." *Id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

## IV.   Analysis

As an initial matter, the parties agree that Defendant was seized when the two marked officers approached the taxicab and placed a laptop on the hood of the taxi, which prevented it from moving.  (*See* ECF No. 17 at Pg ID 58; ECF No. 21 at Pg ID 79.)  Additionally, the officers also stood at the open door while questioning the Defendant, followed by additional officers approaching the vehicle, including an officer accompanied by a drug sniffing dog. *See United States v. Gross*, 662 F.3d 393, 398–99 (6th Cir. 2011) ("Although [l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures by approaching individuals in public places and asking questions, a consensual encounter becomes a seizure when in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.") (alterations to original)

The Government contends that this seizure was lawful, and officers obtained the requisite reasonable suspicion under the totality of the circumstances:

> [Defendant] exited the bus station with police presence immediately after being dropped off, *plus* he arrived to

7

> board a bus **known** to law enforcement to be used by drug
> traffickers to distribute drugs out of state, **plus** he arrived
> late for that bus, **plus** he quickly got into a different car
> from his drop-off vehicle and told the driver to leave,
> which is all consistent with drug trafficking activities.

(ECF No. 21 at Pg ID 83.)

Defendant maintains that "[n]othing about [Defendant's] behavior in the bus
station supports a 'particularized and objective basis' for suspecting he was
engaged in any criminal activity." (ECF No. 17 at Pg ID 60) (referencing *United
States v. Cortez*, 449 U.S. 411, 417–18 (1981)). To support this argument,
Defendant notes that his behavior "can be explained in several innocuous ways. He
could have forgotten his ticket or a piece of luggage; he could have received some
last-minute information that precluded him from boarding the bus, such as a family
emergency." (*Id.* at Pg ID 61.)

## A.    Reasonable Suspicion

First, the Court is not satisfied that the officers had the requisite reasonable
suspicion in order to seize Defendant. Again, it is settled that an officer's reliance
on a mere hunch is insufficient to justify a seizure under the Fourth Amendment.
*United States v. Arvizu*, 534 U.S. 266, 274 (2002); *Campbell*, 549 F.3d at 370. As
a general rule, reasonable suspicion cannot be ascertained from a suspect's
ambiguous behavior. *See United States v. Young*, 707 F.3d 598, 603 (6th Cir.

2012) ("Ambiguous behavior does not give rise to reasonable suspicion because "reasonable suspicion looks for the exact opposite of ambiguity.")

To support the alleged reasonable suspicion, the government points to the fact that Defendant "arrived late for the departing bus (which some drug traffickers do to avoid law enforcement)" and that the particular bus route is known for drug trafficking. (ECF No. 21 at Pg ID 77.) However, this argument fails because the government has not produced any evidence that Defendant was even attempting to board that particular bus. According to the police report, Defendant took a few steps into the bus station "then immediately turn[ed] around and exit[ed] the station." (ECF No. 17-2 at Pg ID 68.) Despite the government's assertions that Defendant exited due to the presence of marked officers, the picture from the video still footage shows Defendant, within seconds upon entry, looking down at something in his hand and then exiting the station. (See ECF No. 17 at Pg ID 51–52.) Defendant did not make it far enough into the bus station to confirm, or even reasonably assume, that he was attempting to board that particular bus or if he was potentially arriving early to wait for the following departure.

Next, the government maintains that Defendant's arrival in one vehicle and attempting to leave the station in the taxicab is a factor, that once taken into account with the others, provides the necessary reasonable suspicion. The Court disagrees. In today's society where rideshares are a common form of

9

transportation, the government had no way of knowing, nor assuming, that Defendant would leave in the same vehicle in which he arrived.

Further, the government points to contextual factors in support of its inference of reasonable suspicion. For example, the government states that Defendant "arriv[ed] to board a bus *known* to law enforcement to be used by drug traffickers to distribute drugs out of state" and noted that evasive acts can support a finding of reasonable suspicion, including being present in a "hot spot of drug and gun activity" and "nervous, evasive behavior." (ECF No. 21 at Pg ID 82.) As the Court already stated, the government did not know if Defendant was at the station to board the particular bus known to be used by drug traffickers; this was merely a hunch. Also, the government proffered no evidence as to any actions by Defendant demonstrating nervous behavior that occurred before Defendant was seized. According to the video footage, Defendant left the station and casually, not hurriedly, walked over to the taxicab and entered the vehicle. Once inside the vehicle and *after* he was already seized by officers, Defendant allegedly "appeared startled [and] kept looking past [the] officers." Of course, incidents that occur *after* a seizure has taken place cannot be a basis of reasonable suspicion in a Fourth Amendment analysis. *See United States v. Bloodsworth*, 798 F. App'x 842, 846 (6ᵗʰ Cir. 2019) (quoting *Terry v. Ohio* 392 U.S. at 21–22) (noting that the reasonable suspicion inquiry asks whether "the facts available to the officer at the

10

moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate.").

The Court acknowledges that it should not dismiss certain factors due to their individual, and potentially innocent, explanations. *See United States v. Ellis*, 497 F.3d 606, 614 (6th Cir. 2007) (citing *Arvizu*, 534 U.S. at 267). However, the Sixth Circuit also warns that "contextual factors, such as high-crime [or hot spots], should not be given too much weight because they raise concerns of racial, ethnic, and socioeconomic profiling." *Young*, 707 F.3d at 603; *see also Floyd v. City of New York*, 959 F. Supp. 2d 540, 581 (S.D.N.Y. 2013) (determining that "[t]he High Crime Area stop factor is likewise problematic" and "[p]resence in an area with high rates of crime is not a sufficient basis for a stop, although it *may* contribute to reasonable suspicion.") (emphasis added).

Once the Court reduces the weight placed on the bus being known as a hot spot for trafficking and the fact that the government has failed to provide evidence that defendant was attempting to board the specific bus in question, the government is only left with the allegation that Defendant arrived at a bus station, looked down at his hands, exited, and got into a taxicab. While the officers may be aware that there is drug trafficking facilitated by some individuals who are at the bus station, this trafficking by certain persons does not characterize the entire bus

11

station as a location of drug trafficking.  Defendant's mere presence at the bus

station, without more, is not enough to rise to the level of reasonable suspicion.

Finally, whether Defendant conveyed to the driver that he was in a rush to

leave, as the government asserts, is not relevant to the Court's inquiry because

officers approached the vehicle and seized Defendant *before* obtaining the

testimony from the taxicab driver.  (ECF No. 17-2 at Pg ID 69.)  Again, the

reasonable suspicion inquiry relies on facts available at the moment of the seizure,

not obtained after the fact.  *See Bloodsworth*, 798 F. App'x at 846 (quoting *Terry*,

392 U.S. at 21–22.)  Under the totality of the circumstances, the facts only provide

a "mere hunch" that criminal activity may have been present. *See Campbell*, 549

F.3d at 370.  The Court finds that reasonable suspicion did not exist for the officers

to seize Defendant, and as such, the seizure was unlawful and in violation of the

Fourth Amendment.

## B.    Attenuation Doctrine

The Government maintains that even if the Court finds that a constitutional

violation is present, the attenuation doctrine would apply.  The exclusionary rule

prohibits the introduction of evidence directly acquired by an unlawful search or

seizure, as well as "derivative evidence, both tangible and testimonial, that is the

product of the primary evidence." *Murray v. United States*, 487 U.S. 533, 536

(1988).  However, "[t]he fact that a Fourth Amendment violation occurred—*i.e.,*

that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009) (citing *Illinois v. Gates*, 462 U.S. 213, 223 (2006)).

Under the attenuation doctrine, evidence that would normally be excluded due to a Fourth Amendment violation may be admissible "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).  In other words, attenuation "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost."  *United States v. Leon*, 468 U.S. 897, 911 (1984); *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. 2022).  The Supreme Court provides three factors to analyze the attenuation of evidence: (1) the "temporal proximity between the initially unlawful stop and the search," (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct[.]" *Strieff*, 579 U.S. at 233 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)) (internal quotations omitted).  "No single factor in this analysis is

dispositive of attenuation." *United States v. Beauchamp,* 659 F.3d 560, 573 (6th Cir. 2011).

Here, the parties agree that the first *Brown* factor—the temporal proximity between the initially unlawful stop and the search—weighs "heavily in favor of suppression" and against the application of the attenuation doctrine.  (ECF No. 23 at Pg ID 101; ECF No. 25 at Pg ID 107.)  Specifically, the government concedes that there is "no lapse in time between the seizure of Cottrell and the discovery of the drugs in his luggage—it was one continuous episode spanning a few minutes." (ECF No. 23, Pg ID 101-02.)

 The second *Brown* factor—the existence of intervening circumstances— weighs in favor of attenuation.  The government maintains that because of the preexisting warrant for Defendant's arrest for cocaine possession, the drugs would have been discovered when he was transported to jail.  Defendant maintains that this factor weighs in favor of suppression because the officers only became aware of the warrant "through their exploitation of their unconstitutional seizure of Mr. Cottrell."  (ECF No. 25 at Pg ID 107.)  However, a valid warrant that predates the unconstitutional conduct and "is entirely unconnected with the stop" supports attenuation. *Strieff*, 579 U.S. at 240-41.

Finally, the third *Brown* factor—the purpose and flagrancy of the violation—weighs in favor of suppression.  The *Strieff* case involved an officer

14

who received an anonymous tip about potential drug activity and as a result, began an investigation into "a particular residence" over a course of a week.  *Id.* at 235. As the officer surveilled the home, he noticed visitors who would enter and exit within a few minutes.  *Id.*  Due to the "sufficiently frequent" visits to the home, the officer's suspicion was raised that the residents were dealing drugs out of the home.  *Id.*  A week into the investigation, the defendant left the home and walked to a nearby store, where the officer detained and questioned him before requesting identification. *Id.*  After relaying the defendant's identification to the police dispatcher, the officer was notified of an arrest warrant, arrested the defendant, and as a search incident to arrest, discovered the drugs.  *Id.* at 235-36.

Here, unlike the officer in *Strieff*, Officers Bloom and Keiser were not conducting a week-long, detailed, "bona fide investigation of a suspected drug house," which was the foundation of the unlawful seizure.  *Strieff*, 579 U.S. at 242. Instead, the officers were merely conducting a routine interdiction, randomly observed Defendant exit a vehicle and take a few steps into a public bus station before leaving and getting into a taxicab.  Not only was the decision to seize Defendant based on a mere hunch that he may be arriving to board a particular bus absent any proof, but the seizure also lacked any meaningful investigation and was supported by weak contextual evidence that likely goes against public policy. *See e.g., Young*, 707 F.3d at 603. ("contextual factors, such as high-crime [or hot

15

spots], should not be given too much weight because they raise concerns of racial, ethnic, and socioeconomic profiling.").  The case before the Court presents a plethora of unknown and unsupported variables—none of which can support a finding of reasonable suspicion—which amounts to a flagrant violation of the Fourth Amendment.

## V.    Conclusion

For the reasons set forth above, the Court finds that Defendant's Fourth Amendment rights were violated due to officers' lack of reasonable suspicion for the unlawful seizure.  Further, the Court finds that the attenuation doctrine does not apply in this case because the unlawful seizure and the discovery of drugs was not so attenuated as to dissipate the taint.  *See, e.g., Beauchamp*, 659 F.3d at 571 (6th Cir. 2011) (evidence discovered during a search conducted after an illegal seizure suppressed because the "taint" of the seizure had not "dissipated"); *United States v. Lopez-Arias*, 344 F.3d 623, 626, 628–30 (6th Cir. 2003) (evidence found during a search executed after an unlawful seizure suppressed because there was "no intervening act of free will sufficient to break the causal chain"); *United States v. Buchanan*, 904 F.2d 349, 355–57 (6th Cir. 1990) (same).

Accordingly,

16

**IT IS ORDERED** that Defendant's Motion to Suppress (ECF No. 17) is

**GRANTED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: October 21, 2022